Joshua Cash
Mark G. Ledwin
WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER, LLP
*Attorneys for Plaintiff*
150 East 42nd Street
New York, New York 10017-5639
(212) 915-5812
Joshua.Cash@wilsonelser.com
Mark.Ledwin@wilsonelser.com

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

| | |
|---|---|
| NATIONAL CREDIT UNION ADMINISTRATION : | |
| BOARD, as Liquidating Agent for MELROSE CREDIT | Civil Action No.: 1:23-cv-01061 |
| UNION, : | |
| | |
| Plaintiff, : | |
| | |
| - against - : | |
| | |
| ALAN KAUFMAN and MITCHELL REIVER, : | |
| | JURY TRIAL DEMANDED |
| Defendants, : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**COMPLAINT**

Plaintiff, the National Credit Union Administration Board ("NCUAB"), in its capacity as

Liquidating Agent for Melrose Credit Union ("Melrose") (collectively, "Plaintiff"), by and through

its undersigned counsel, brings this Complaint against Defendants, Alan Kaufman ("Kaufman")

and Mitchell Reiver ("Reiver") (collectively, "Defendants"), both former officers and board

members of Melrose, for breach of fiduciary duty, aiding and abetting breach of fiduciary duty,

and unjust enrichment, and in support of its Complaint, alleges as follows:

**JURISDICTION AND VENUE**

1. This Court has subject matter jurisdiction over this dispute pursuant to 12 U.S.C. §

1789(a)(2) because the NCUAB is a party to this litigation and because the NCUAB has

280015811v.1

commenced this litigation to carry out the purposes of Subchapter II of the Federal Credit Union Act ("FCUA").

2.      Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because Defendants reside within this District and because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District.

## PARTIES

3.      The NCUAB manages the National Credit Union Administration ("NCUA"), an independent federal agency that operates under the FCUA, 12 U.S.C. 1751 *et seq.*, as amended through P.L. 116-260, enacted December 27, 2020.  Among other responsibilities, the agency is responsible for chartering and regulating federal credit unions, and federally-insured, state-chartered credit unions, and managing the National Credit Union Share Insurance Fund ("NCUSIF").  The NCUA is also authorized by federal statute to act as a conservator of financially troubled credit unions and as liquidating agent of liquidated credit unions.  The agency is headquartered in Alexandria, Virginia and operates nationwide.

4.      Melrose was a state-chartered, federally-insured, credit union located in Briarwood, New York.  The credit union provided a variety of financial services to its members, with a primary focus on taxi medallion lending in New York City.  Melrose was regulated by the New York Department of Financial Services ("DFS") as well as the NCUA, which also insured it.

5.      On February 10, 2017, DFS conserved Melrose and appointed the NCUAB as its conservator.  At the time it was conserved, Melrose had assets of approximately $1.78 billion.

6.      On August 31, 2018, DFS liquidated Melrose and appointed the NCUAB as the liquidating agent.  As the liquidating agent of Melrose, NCUAB succeeds to all rights, powers and privileges of Melrose.  *See* 12 U.S.C. § 1787(b)(2)(A)(i).

7.      The NCUAB has brought this lawsuit in its capacity as liquidating agent of Melrose for the benefit of the stakeholders of the asset management estate of Melrose, which includes its unpaid creditors, the NCUSIF, and former members of the credit union.

8.      All claims asserted herein are timely by virtue of the NCUA Extender Statute, 12 U.S.C. § 1787(b)(14), which provides NCUAB "(i)in the case of any contract claim . . . the 6-year period beginning on the date the claim accrues . . ." and "(ii) in the case of any tort claim . . . the period applicable under State law."  The date of accrual for all claims set forth in this Complaint is the date that the NCUAB was appointed conservator of Melrose. 12 U.S.C. § 1787(b)(14)(B)(i).

9.      Defendant Alan Kaufman resides within the jurisdiction of this Court.

10.     Defendant Mitchell Reiver resides within the jurisdiction of this Court.

## BACKGROUND FACTUAL ALLEGATIONS

*Defendants' Employment with Melrose*

11.     Beginning on or about May 1, 1998 and at all times relevant to this Complaint, Kaufman was the Chief Executive Officer ("CEO") of Melrose.  He also served as Treasurer of the Melrose Board of Directors ("Melrose Board").

12.     On or about June 28, 2016, Kaufman was removed for cause as CEO by the Melrose Board.  On or about October 25, 2016, Kaufman was removed as a Treasurer of the Melrose Board.

13.     Beginning in or about the year 1989, and at all times relevant to this Complaint, Reiver was General Counsel to Melrose.  In late 2016, following Kaufman's removal, Reiver became a member of the Melrose Board, taking Kaufman's place, and held that position until Melrose was conserved by DFS.  Reiver also served as Melrose's chief compliance officer.

14.     Reiver had previously acted as the assistant secretary to the Melrose Board.  In such role, Reiver was responsible for taking minutes for Melrose Board meetings.  Reiver also served on Melrose's Asset Liability Management Committee. Part of his role in serving on that committee involved his receipt of Melrose's exception report, which identifies loans that are nonconforming with Melrose's lending policy and the reasons for nonconformance.

15.     Reiver was terminated effective February 10, 2017, the date that Melrose was conserved.

16.     During the Defendants' employment with Melrose, Kaufman and Reiver were aware of, and were obligated to comply with, Melrose's Anti-Bribery Policy.  That policy specifically prohibited all Melrose officers from "soliciting for themselves or a third party . . . anything of value for anyone in return for any business, service or confidential information of the Credit Union and of accepting anything of value from anyone in connection with the business of the Credit Union, either before or after a transaction is discussed or consummated."  Credit union employees who received or were offered "something of value beyond what [wa]s expressly authorized by [the] policy," were required to disclose such instances to the Melrose Board.

17.     Defendants were aware of, and obligated to comply with, Melrose's Employee Handbook that, in part, prohibited all employees from receiving "any gift or gratuity" worth over $100 from any of Melrose's members, vendors, and suppliers.

18.     In most years, Kaufman and Reiver executed Melrose's forms acknowledging their duties and responsibilities to comply with all of the policies contained in the Melrose Employee Handbook.  Kaufman confirmed that he understood the policies and rules outlined in the employee handbook by signing copies in 2002 and 2016.  Reiver confirmed that he understood the policies and rules outlined in the employee handbook by signing copies in 1995 and 2002.

19.     On various dates throughout their employment Kaufman and Reiver executed oaths, pursuant to New York Banking Law § 468, that were filed with DFS, to the effect that Kaufman and Reiver would diligently and honestly administer the affairs of Melrose.

**Split-Dollar Insurance Agreement**

20.     On February 14, 2006, at Kaufman's request, the Melrose Board approved Split-Dollar Insurance Agreements ("SDIAs") for Kaufman, Reiver, and one other Melrose employee. The agreements for Reiver and Kaufman are both materially-identical and are both dated April 25, 2006.

21.     The policies are whole-life life insurance policies, issued by Massachusetts Mutual Life Insurance Company and administered by CUNA Mutual Group.  As whole life insurance policies, the policies have both a cash value for which the policy may be redeemed during the insured's lifetime and a death benefit that is paid upon the insured's death.

22.     Both agreements provide that "[i]n consideration for the benefits provided under this Agreement, the Employee agrees to diligently and faithfully serve the Employer during the period beginning on the date hereof and continuing until the later of the eighth anniversary of the date of this Agreement."

23.     The Kaufman policy had an initial death benefit of $3,011,649.  The agreement required Melrose to make eight yearly payments of $150,000 to purchase the policy in consideration for an assignment of the policy to Melrose, creating a security interest in the policy corresponding with such amounts.  In the event of Kaufman's death, Melrose is to be reimbursed in the amount of its security interest, plus one-percent interest accruing, with the remainder payable to Kaufman's beneficiaries.

5

24.     The Reiver policy had an initial death benefit of $2,071,074.  The agreement required Melrose to make eight yearly payments of $100,000 to purchase the policy in consideration for an assignment of the policy to Melrose, creating a security interest in the policy corresponding with such amounts.  In the event of Reiver's death, Melrose is to be reimbursed in the amount of its security interest, plus one-percent interest accruing, with the remainder payable to Reiver's beneficiaries.

25.     In 2013, Kaufman requested that the insurance company extend the SDIAs for two years, for the benefit of Kaufman and Reiver, thereby requiring Melrose to make an additional $300,000 in premium payments for the additional years (years 9 and 10) for him and to make an additional $200,000 in premium payments for the additional years (years 9 and 10) for Reiver.

26.     Kaufman agreed to the amendment of the existing SDIAs without informing or otherwise notifying the Melrose Board of his actions.  Nor did Reiver make the Melrose Board aware of the amendment to the SDIAs.

27.     As a result of the amendment, between 2006 to 2016, Melrose paid a total of approximately $1,500,000 in premiums into the Kaufman SDIA.  Excluding the loans against the policy in favor of MassMutual, as of March 2022, the cash redemption value of the Kaufman policy was $2,311,836.16 and the death benefit was $4,019,466.00.

28.     As a result of the amendment, between 2006 to 2016, Melrose paid a total of approximately $1,000,000 in premiums into the Reiver SDIA.  Excluding the loans against the policy in favor of MassMutual, as of March 2022, the cash redemption value of the Reiver policy was $1,543,164.42 and the death benefit was $2,749,562.00.

280015811v.1

*Split-Dollar Insurance Loans*

29.     Following the eighth anniversary of the policies, Defendants were permitted to take a loan against the cash value of the policy under certain conditions.  Specifically, the loan against the policy could not deplete the accumulated cash value below the aggregate of all of Melrose's paid-in premiums.

30.     On September 13, 2013, MassMutual instructed Kaufman that he could not borrow from the policy if his loan caused the cash-surrender value of the policy to fall below the amount of the paid-in premiums.

31.     Melrose Board approval was always required before the Defendants could take a loan against the SDIA, and the Board was required to independently verify that any loan did not impair the value of the policy.

32.     Kaufman intentionally failed to inform the Board of its independent obligation to verify that Kaufman's loan would not impair the value of the policy.

33.     On March 10, 2014, Kaufman dishonestly caused Melrose Board Member and longtime personal friend ("LK") to sign Kaufman's application for a $350,000 loan from the SDIA, without allowing LK to review the document, without explaining to LK the purpose and significance of the document and without advising LK that the Board was required to independently verify that Melrose's position would not be impaired by such a loan.

34.     On or about April 16, 2014 and August 13, 2014, Kaufman submitted two additional loan applications, each in the amount of $100,000, and obtained the signatures of longtime friend and Board Member "LD" on the applications, without informing LD of the contents or significance of the documents she was signing.  In January 2015 and August 2015, Kaufman borrowed another $200,000 and $100,000, respectively.

35.     On or about August 2014 and August 2015, Reiver borrowed $90,000 and $128,000 against his policy.  Both loans to Reiver were approved by Kaufman.

36.     On September 20, 2015, the Melrose Board engaged Dechert LLP to conduct an internal investigation into possible malfeasance by Kaufman and Melrose's management.

37.     Aware of his own covert misconduct and that he would likely be terminated upon completion of the Dechert investigation, and that his continued employment was a prerequisite for obtaining any further loans against the SDIA, Kaufman prepared an application to obtain a further loan in the amount of $1,100,000 prior to the completion of the Dechert investigation.

38.     On April 8, 2016, Kaufman obtained the blind signature of his longtime neighbor and Board Member ("PW") on Kaufman's application for the additional $1,100,000 loan, without advising PW of the contents of the document he was signing, or advising PW of its contents or significance, or informing PW that the Melrose Board was required to independently verify that its interests would not be impaired by the requested loan.

39.     On or about August 2016 and January 2017, Reiver borrowed $150,000 and $250,000, respectively, against his policy.  Both loans were approved by PW.  Both loans impaired Melrose's interest in the policy as they caused the $1,000,000 owing to Melrose to no longer be fully secured by the cash value of the policy.

40.     Because the loans to MassMutual must be repaid from the policies proceeds prior to any payment to Melrose, the loans taken by Defendants impaired Melrose's financial interests in the policies.

## ALLEGATIONS OF DISHONEST AND UNFAITHFUL ACTS

*Briarwood Transfer Services*

41.     On July 11, 2002, Reiver established Briarwood Transfer Services, LLC ("BTS") under New York law as a limited liability company owned in equal shares by him and Kaufman.

42.     BTS was organized to serve as a broker in the sale of taxi medallions, coordinating the sale and transfer of a medallion with the New York Taxi & Limousine Commission ("TLC") and collecting a commission on each transfer.

43.     BTS earned commissions primarily for the transfer of taxi medallions secured by loans from Melrose, which Reiver, Kaufman and other Melrose employees referred to BTS.

44.     BTS never had any employees of its own at any time relevant to this Complaint.

45.     BTS was physically located, and conducted its business, in the Melrose main branch building located in Briarwood, New York.

46.     BTS periodically made payments to Melrose or to Member Brokerage Services, a wholly owned Credit Union Service Organization, for facilities usage and distributions.

47.     Reiver was a full-time employee of Melrose throughout all times relevant to this Complaint.  Reiver was the only in-house attorney employed by Melrose.  As of 2014, Reiver was compensated by Melrose more than $270,000 annually to perform the full-time services required in his position as General Counsel.

48.     During the tenure of BTS's operation, Reiver devoted a significant amount of his time during working hours performing work for BTS to the detriment of his duties for Melrose and while being paid by Melrose.  As early as 2007, Reiver's annual performance appraisal recognized that he was performing BTS services to the detriment of his Melrose duties.

280015811v.1

49. Kaufman was a full-time employee of Melrose throughout all times relevant to this Complaint.

50. Kaufman personally kept the books for BTS.

51. During the tenure of BTS's operation, Reiver and Kaufman directed other Melrose employees to perform BTS functions during hours when they were obligated to be working for Melrose to the detriment of their duties for Melrose and while those other employees received full-time pay on Melrose's payroll. Reiver and Kaufman diverted other Melrose resources to those employees in order to perform BTS functions, including the use of a Melrose-owned automobile.

52. Almost all of the BTS transactions involved taxi medallion loans that were financed by Melrose.

53. The members of the Melrose Board (excluding Kaufman) never approved Kaufman and Reiver's involvement with BTS. The members of the Melrose Board (other than Kaufman) were never aware that Reiver and Kaufman were personally profiting from BTS.

54. Beginning in 2003 and continuing until 2017, in addition to his compensation as an employee of Melrose, Reiver received periodic distributions from the profits of BTS totaling at least $206,566.45.

55. Beginning in 2003 and continuing until 2017, in addition to his compensation as an employee of Melrose, Kaufman received periodic distributions from the profits of BTS totaling at least $201,000.

**Bribes Received from One of Melrose's Largest Taxi Medallion Borrowers**

56. Tony Georgiton ("Georgiton") had been a Melrose member since at least the early 1990s and was one of Melrose's largest taxi medallion borrowers.

57.     Around the fall of 2010, Kaufman was going through a divorce.  In December 2010, Georgiton and Kaufman arranged for Georgiton to purchase a house for Kaufman.  Kaufman selected a house in a gated community with a pool and tennis courts in Jericho, New York (the "Jericho Residence").  Georgiton bought the house in his own name for the purchase price of $630,000.

58.     Kaufman, Georgiton, and Reiver all attended the closing for the Jericho Residence. At Kaufman's request, Reiver represented Georgiton at the closing without charging a fee for his services.  Reiver's wife was the title closer for the closing and also attended.

59.     At the time of the closing, Reiver was aware that Kaufman would be living in the Jericho Residence, even though the property was being purchased by Georgiton.  Reiver was also aware that Georgiton was one of Melrose's largest taxi medallion borrowers.

60.     Kaufman intentionally failed to notify any other member of the Melrose Board of the closing or that he would be residing at a residence purchased by Georgiton.

61.     Reiver intentionally failed to notify the Melrose Board of his involvement with the closing on the Jericho Residence or that Kaufman would be residing at a residence purchased by Georgiton, until on or about June 2016, at which time Reiver sent a letter to DFS about several of the dishonest acts identified herein.  At that point in time, those details had already been revealed to the Melrose Board through the Dechert investigation, which included a May 2016 interview of Kaufman.

62.     Kaufman lived at the Jericho Residence without paying rent for more than two years, from around 2011 to 2013.  Kaufman never disclosed to the Melrose Board that he lived rent-free in a house that Georgiton had bought.

63.     Although Kaufman paid taxes and homeowners association fees on the Jericho Residence while living there rent-free, Kaufman made it appear as if such payments had been made by Georgiton.  Kaufman opened an account at Melrose in Georgiton's name and deposited his own money into the account.  Kaufman then drew checks on the account, which he signed with Georgiton's name without power of attorney to do so.  From 2011 to 2012, he signed Georgiton's name on more than fifty checks to pay taxes and fees on the Jericho Residence.

64.     Before and while living at the Jericho Residence rent-free, Kaufman approved millions of dollars of loans for Georgiton and his companies.  From 2010 to 2012, Kaufman personally and repeatedly approved fifty-year amortization loans for Georgiton and his companies, although Kaufman did not regularly approve loans.

65.     The loans were written on terms favorable to Georgiton to the detriment of Melrose. Many of the loans did not comply with Melrose's loan policies, including out-of-policy loan-to-value ratios, debt service coverage ratios, and balloon terms.   NCUA examiners and Kaufman's colleagues expressed concerns about the loans.

66.     Reiver knew of the unfavorable terms and expressed concerns about them in an email in June 2011.  Reiver was responsible for drafting addendums to promissory notes, such as those included with the loans to Georgiton, and he would have also reviewed the loans in connection with his responsibilities with Melrose's Asset Liability Management Committee.

67.     In September 2011, while living at the Jericho Residence rent-free, Kaufman presented Melrose's Board with a proposal under which Melrose would pay $2 million for the naming rights to an entertainment venue, later called the Melrose Ballroom, from an entity owned in part by Georgiton.  Melrose's marketing director informed both Kaufman and Reiver that the naming rights were worth only $50,000 annually.

68.     In reliance on Kaufman's representations about the purported value of the naming rights, the board approved the agreement on the condition that no payments be made to Georgiton's company until construction on the ballroom was finished.  The final naming rights agreement required Melrose to pay $2 million to Georgiton's company over five years, in installments of $400,000.

69.     Reiver negotiated the contract between Melrose Credit Union and Georgiton's company for Melrose to have naming rights for the venue.  Reiver was aware that Georgiton was one of the shareholders of the company.  The final contract negotiated by Reiver was approved only by Kaufman and was not approved by any other Melrose Board member.

70.     In negotiating the contract, Reiver performed diligence with respect to the value of naming rights.  Despite such diligence and despite the opinion of Melrose's own marketing director about what little value the rights had, Reiver intentionally failed to notify the Melrose Board of the unfairness and wastefulness of the deal.

71.     Construction on the Melrose Ballroom had not yet been completed in December 2012.  Nevertheless, Kaufman directed Melrose's comptroller to pay Georgiton's company the first $400,000 installment.  Over the next four years, with the knowledge of Kaufman and Reiver, Melrose paid Georgiton's company each of the remaining installments.

72.     In January 2013, Kaufman bought the Jericho Residence from Georgiton for $630,000, the same price that Georgiton paid for it in 2010.  In order to purchase the property, Kaufman took out a $200,000 loan from Melrose that was cosigned by Georgiton and fully secured by Georgiton's Melrose shares.  Kaufman also "borrowed" $240,000 from Georgiton, for which Georgiton took out a loan from Melrose.  Kaufman never repaid any of the $240,000 Georgiton purportedly "lent" to him.  Kaufman also utilized a portion of the $350,000 loan from the SDIA in

13

2014 to repay the Melrose loan secured by Georgiton's shares, for which a lump sum payment was due in 2014.

73.     Reiver again performed the closing for the sale of the Jericho Residence from Georgiton to Kaufman and Kaufman's now-wife, representing all parties to the transaction. There was no contract of sale for the transaction. Reiver's wife was the title closer for the closing. Reiver was aware that the purchase price was the same as the purchase price for the earlier purchase of the Jericho Residence by Georgiton.

74.     Kaufman intentionally failed to disclose to Melrose Board that he purchased the Jericho Residence from Georgiton, or that Kaufman financed his purchase of the Jericho Residence with loans from Georgiton.

75.     Reiver intentionally failed to disclose to any member of the Melrose Board his involvement with the closing or that Kaufman would be residing at a residence that he purchased from Georgiton until on or about June 2016, at which time Reiver sent a letter to DFS about several of the dishonest acts identified herein. At that point in time, those details had already been revealed to the Melrose Board through the Dechert investigation, which included a May 2016 interview of Kaufman.

76.     In a letter dated June 10, 2016, Reiver informed DFS about several of the dishonest acts identified above, including the favorable loans to Tony Georgiton, Kaufman's living at the Jericho Residence rent free, Kaufman's purchase of the Jericho Residence with money from Georgiton, and the naming rights agreement with Georgiton's company. Those details had already been revealed to the Melrose Board through the Dechert investigation, which included a May 2016 interview of Kaufman. All or most of the details contained in the letter had been known by Reiver at the time the events occurred and/or prior to June 2016.

*Wasteful Spending on Advertising*

77.     From 2010 to 2015, Kaufman accepted a number of luxury vacation packages from CBS Radio under CBS's "incentive vacation plan."  Under that program, CBS Radio offered its clients fully-paid vacations if they incrementally increased their advertising spent with CBS Radio over a certain amount of time.

78.     Kaufman spent Melrose's money on CBS Radio's advertising services, and increased Melrose's spending on CBS Radio's advertising services, in order to obtain vacation packages under CBS Radio's incentive program for his own personal benefit.  The vacation packages that Kaufman accepted from CBS Radio included luxury hotel stays, airfare, dinners, activities, and excursions, and included locations such as Paris, Hawaii, and the Super Bowl.  In a series of emails, Kaufman solicited the Super Bowl trip through threats direct at a CBS Radio representative from whom Kaufman purchased advertising on Kaufman's behalf.

## FACTS CONCERNING PRIOR PROCEEDINGS

*NCUA Administrative Proceedings*

79.     On August 7, 2019, pursuant to 12 U.S.C. § 1786(i)(1)(A), the NCUAB issued a Notice of Prohibition with respect to Kaufman.  Pursuant to that Notice, Kaufman is prohibited "from further participation in the affairs of any credit union without the prior written consent of the NCUAB, and Kaufman is prohibited from otherwise participating, directly or indirectly, in any manner in the conduct of the affairs of any credit union."

80.     On October 15, 2018, Reiver entered into a Stipulation and Consent to Issuance of an Order of Prohibition with Order of Restitution.  Such order "prohibits Mr. Reiver from participating in any manner in the conduct of the affairs of any federally insured credit union, and from continuing or commencing to hold any office, or participate in any manner, in the conduct of

280015811v.1

the affairs of any other institution or agency set forth in . . . 12 U.S.C. § 1786(g)(7) . . . ."  Such order further required Reiver "to pay restitution in the amount of $77,166.45 to Melrose Credit Union[.]"

81.     In that Stipulation, Reiver agreed "that, other than a credit for the restitution being paid thereunder, the Order does not release, discharge, compromise, settle, dismiss, resolve, or in any way affect any actions claims, charges against, or liabilities that arise in connection with his affiliations with Melrose Credit Union, or any affiliate thereof, and that may be or have been brought by NCUAB or any Federal or state government agency or entity other than an administrative enforcement claim against him by the NCUAB referred to in this subparagraph . . ."

***Criminal Proceeding***

82.     On July 10, 2019, a federal grand jury sitting in the Southern District of New York returned an indictment in Case No. 19-CR-504, *United States v. Alan S. Kaufman and Tony Georgiton*.  The indictment contained one count charging Kaufman and Georgiton with Conspiracy to Violate the Bank Bribery Act (18 U.S.C. § 371) and two counts of substantive Bank Bribery Act violations (18 U.S.C. § 215(a)(2)), arising from the facts set forth in paragraphs 56 through 78 of this Complaint.  (ECF No. 1.)

83.     On September 9, 2020, Georgiton pled guilty in the Southern District of New York to one count of Conspiracy (with Kaufman) to Commit Bank Bribery Act violation in relation to the Melrose Ballroom Naming Rights Agreement.  (ECF No. 133.)

84.     On March 31, 2021, following a multi-week trial in the Southern District of New York, where various former Melrose Board members, including Reiver and Kaufman, all testified, the jury returned verdicts of "guilty" against Kaufman as to both counts of Bank Bribery Act violations. (ECF No. 219.)

85.     Pursuant to 18 U.S.C. § 3664(l), the "conviction of a defendant for an offense involving the act giving rise to an order of restitution shall estop the defendant from denying the essential allegations of that offense in any subsequent Federal civil proceeding or State civil proceeding, to the extent consistent with State law, brought by the victim."  Accordingly, Kaufman may not deny the "essential allegations" of the Bank Bribery Act violation of which he was convicted at trial as to the victim of that crime, the NCUAB, as established by the order of restitution entered in that criminal case (ECF No. 251).

## FIRST CAUSE OF ACTION – Breach of Fiduciary Duty
### (All Defendants)

86.     The NCUAB incorporates the allegations of paragraphs 1-85, above, as if fully set forth herein.

87.     As CEO and Treasurer of Melrose, Kaufman had fiduciary obligations to Melrose at all times relevant to this Complaint.  Those obligations included a duty of loyalty, a duty to act in good faith, and a duty to avoid and prevent waste.

88.     As General Counsel and Compliance Officer for Melrose, and later as a Melrose Board member, Reiver had fiduciary obligations to Melrose at all times relevant to this Complaint. Those obligations included a duty of loyalty, a duty to act in good faith, and a duty to avoid and prevent waste.

89.     Defendants knowingly agreed to cooperate in operating BTS for their shared benefit, knowing that doing so was in breach of their fiduciary duties to Melrose.

90.     Defendants breached their fiduciary duties to Melrose through operating, and profiting from, BTS.  Among other acts, Defendants: (a) profited from BTS even though the profits and the opportunity to profit belonged to Melrose; (b) operated and profited from BTS without

approval from the Melrose Board; and (c) misused their time and other employee time, and resources belonging to Melrose, in order to operate and profit from BTS.

91.     As a result of Defendants' breaches, Melrose was harmed in an amount no less than $407,566.45, and Defendants are jointly and severely liable for such amounts.  Because such breaches are breaches of the duty of loyalty, Melrose is permitted under New York faithless servant law to disgorge the benefits and compensation that Defendants received from Melrose, including the life insurance policies purchased by Melrose, regardless of actual damages, for a period of time no less than six years prior to the date of the conservatorship of Melrose.

92.     To the extent disgorgement is not possible, in addition to its other damages, NCUAB is entitled to a money judgment against Defendants in amounts equal to the benefits and compensation that Defendants received from Melrose no less than six years prior to the date of the conservatorship of Melrose as a result of Defendants' breaches of their fiduciary duties.

### SECOND CAUSE OF ACTION – Breach of Fiduciary Duty
### (Alan Kaufman)

93.     The NCUAB incorporates the allegations of paragraphs 1-92, above, as if fully set forth herein.

94.     As CEO and Treasurer of Melrose, Kaufman had fiduciary obligations to Melrose at all times relevant to this Complaint.  Those obligations included a duty of loyalty, a duty to act in good faith, and a duty to avoid and prevent waste.

95.     Kaufman breached his fiduciary duty to Melrose through soliciting and utilizing lavish vacations paid for by CBS Radio in exchange for wasteful increases and spending of Melrose's money for advertising with CBS Radio, which had little or no value for the credit union.

96.     As a result of Kaufman's breach, Melrose was harmed in an amount no less than the amount wastefully spent on advertising.  Because such breach was a breach of the duty of

18

loyalty, Melrose is permitted under New York faithless servant law to disgorge the benefits and compensation that Kaufman received from Melrose, including the life insurance policy purchased by Melrose, regardless of actual damages, for a period of time no less than six years prior to the date of the conservatorship of Melrose.

97.     To the extent disgorgement is not possible, in addition to its other damages, NCUAB is entitled to a money judgment against Kaufman in an amount equal to the benefits and compensation that he received from Melrose no less than six years prior to the date of the conservatorship of Melrose as a result of his breach of his fiduciary duty.

### THIRD CAUSE OF ACTION – Breach of Fiduciary Duty
### (Alan Kaufman)

98.     The NCUAB incorporates the allegations of paragraphs 1-97, above, as if fully set forth herein.

99.     As CEO and Treasurer of Melrose, Kaufman had fiduciary obligations to Melrose at all times relevant to this Complaint.  Those obligations included a duty of loyalty, a duty to act in good faith, and a duty to avoid and prevent waste.

100.    Kaufman breached his fiduciary duty to Melrose through obtaining personal benefits from Georgiton in exchange for monetary benefits.  Among other acts, Kaufman lived rent-free in a house owned and purchased by Georgiton and received money and other benefits from Georgiton in order to later purchase that house, in exchange for proposing and shepherding for approval a wasteful naming right agreement for $2 million of Melrose's money that had little or no value for the credit union, and providing favorable loan terms and interest rates to Georgiton to the detriment of the credit union.

101.    As a result of Kaufman's breach, Melrose was harmed in an amount no less than approximately $2,000,000.  Because such breach was a breach of the duty of loyalty, Melrose is

permitted under New York faithless servant law to disgorge the benefits and compensation that Kaufman received from Melrose, including the life insurance policy purchased by Melrose, regardless of actual damages for a period of time no less than six years prior to the date of the conservatorship of Melrose.

102.     To the extent disgorgement is not possible, in addition to its other damages, NCUAB is entitled to a money judgment against Kaufman in an amount equal to the benefits and compensation that he received from Melrose no less than six years prior to the date of the conservatorship of Melrose as a result of his breach of his fiduciary duty.

### FOURTH CAUSE OF ACTION – Breach of Fiduciary Duty
**(Mitchell Reiver)**

103.     The NCUAB incorporates the allegations of paragraphs 1-102, above, as if fully set forth herein.

104.     As CEO and Treasurer of Melrose, Kaufman had fiduciary obligations to Melrose at all times relevant to this Complaint.  Those obligations included a duty of loyalty, a duty to act in good faith, and a duty to avoid and prevent waste.

105.     As General Counsel and Compliance Officer for Melrose, and later as a Melrose Board member, Reiver had fiduciary obligations to Melrose at all times relevant to this Complaint. Those obligations included a duty of loyalty, a duty to act in good faith, and a duty to avoid and prevent waste.

106.     Kaufman breached his fiduciary duty to Melrose through obtaining personal benefits from Georgiton in exchange for monetary benefits.  Among other acts, Kaufman lived rent-free in a house owned and purchased by Georgiton and received money and other benefits from Georgiton in order to later purchase that house, in exchange for proposing and shepherding for approval a wasteful naming right agreement for $2 million of Melrose's money that had little

or no value for the credit union, and providing favorable loan terms and interest rates to Georgiton to the detriment of the credit union.

107.    Reiver breached his fiduciary duty to Melrose through intentionally failing to notify the Melrose Board of the aforementioned acts of Kaufman, despite knowledge of all or most of those bad acts at or near the time they occurred, causing waste to the detriment of Melrose and permitting Kaufman's disloyalty to proceed to the detriment of Melrose.

108.    As a result of Reiver's aiding and/or abetting of Kaufman's breaches, Melrose was harmed in an amount no less than approximately $2,000,000.  Because such conduct aided and/or abetted a breach of the duty of loyalty, NCUAB is entitled to a money judgment against Reiver in an amount equal to the benefits and compensation that Kaufman received from Melrose no less than six years prior to the date of the conservatorship of Melrose as a result of Kaufman's breach of his fiduciary duty.

## FIFTH CAUSE OF ACTION – Aiding and/or Abetting Breach of Fiduciary Duty
### (Mitchell Reiver)

109.    The NCUAB incorporates the allegations of paragraphs 1-108, above, as if fully set forth herein.

110.    As CEO and Treasurer of Melrose, Kaufman had fiduciary obligations to Melrose at all times relevant to this Complaint.  Those obligations included a duty of loyalty, a duty to act in good faith, and a duty to avoid and prevent waste.

111.    As General Counsel and Compliance Officer for Melrose, and later as a Melrose Board member, Reiver had fiduciary obligations to Melrose at all times relevant to this Complaint. Those obligations included a duty of loyalty, a duty to act in good faith, and a duty to avoid and prevent waste.

280015811v.1

112.   Kaufman breached his fiduciary duty to Melrose through obtaining personal benefits from Georgiton in exchange for monetary benefits.  Among other acts, Kaufman lived rent-free in a house owned and purchased by Georgiton and received money and other benefits from Georgiton in order to later purchase that house, in exchange for proposing and shepherding for approval a wasteful naming right agreement for $2 million of Melrose's money that had little or no value for the credit union, and providing favorable loan terms and interest rates to Georgiton to the detriment of the credit union.

113.   Reiver knowingly participated in Kaufman's above-described breaches, among other acts, by (a) performing the closing for Georgiton's purchase of the house in which Kaufman lived rent free; (b) performing the closing for Kaufman's purchase of the house from Georgiton with money and loans co-signed by Georgiton; (c) deliberately not disclosing either transaction to the Melrose Board despite knowing that Georgiton was one of Melrose's largest taxi medallion borrowers and that Kaufman had provided favorable loan terms and interest rates to Georgiton to the detriment of the credit union; (d) furthering the consummation of a naming rights agreement for $2 million dollars of Melrose's money that had little or no value for the credit union with knowledge that the agreement had little or no value to the credit union; and (e) deliberately not disclosing to the Melrose Board the actual value of the naming rights agreement.

114.   As a result of Reiver's aiding and/or abetting of Kaufman's breaches, Melrose was harmed in an amount no less than approximately $2,000,000.  Because such conduct aided and/or abetted a breach of the duty of loyalty, NCUAB is entitled to a money judgment against Reiver in an amount equal to the benefits and compensation that Kaufman received from Melrose no less than six years prior to the date of the conservatorship of Melrose as a result of Kaufman's breach of his fiduciary duty.

## SIXTH CAUSE OF ACTION – Unjust Enrichment
### (All Defendants)

115.    The NCUAB incorporates the allegations of paragraphs 1-114, above, as if fully set forth herein.

116.    Melrose made payments of $1,500,000 and $1,000,000 million to fund the life insurance policies of Defendants connected with the SDIAs.

117.    Defendants were enriched by Melrose's funding of the policies and are enriched by the policies in that in the event of their deaths, proceeds of the policy will be remitted to their designated policy beneficiaries.

118.    Due to Defendants' lack of faithful service, dishonest acts, and wasteful conduct, among other reasons, equity and good conscience require that Defendants disgorge all benefits from the life insurance policies, and the policies should be turned over to the NCUAB for the benefit of the asset management estate of Melrose.

119.    To the extent disgorgement is not possible, in addition to its other damages, NCUAB is entitled to a money judgment against Defendants in amounts equal to the death benefits of the life insurance policies as a result of Defendants' breaches of their fiduciary duties.

**WHEREFORE**, the NCUAB, as Liquidating Agent for Melrose, respectfully requests that a judgment be entered against Defendants as follows:

(a) On the First Cause of Action – judgment against Defendants, jointly and severally, in the amount of all compensation received from Melrose for a period of time no less than six years prior to the date of the conservatorship of Melrose for their disloyalty and waste in operating and profiting from BTS, including all attorneys' fees, costs and disbursements as provided by law;

280015811v.1

(b) On the Second Cause of Action – judgment against Kaufman, in the amount of all compensation received from Melrose for a period of time no less than six years prior to the date of the conservatorship of Melrose for his disloyalty and waste in soliciting and benefiting from lavish vacations from CBD Radio in exchange for wasteful spending, including all attorneys' fees, costs and disbursements as provided by law;

(c) On the Third Cause of Action – judgment against Kaufman, in the amount of all compensation received from Melrose for a period of time no less than six years prior to the date of the conservatorship of Melrose for his disloyalty and waste in soliciting and benefiting from free rent and other benefits from Tony Georgiton in exchange for Kaufman's approval of favorable loans from Melrose to Kaufman and entry into a wasteful naming-rights agreement, including all attorneys' fees, costs and disbursements as provided by law;

(d) On the Fourth and Fifth Causes of Action – judgment against Reiver, in the amount of all compensation received from Melrose for a period of time no less than six years prior to the date of the conservatorship of Melrose for failing to notify the Melrose Board or otherwise attempt to mitigate Alan Kaufman's disloyalty and waste in soliciting and benefiting from free rent and other benefits from Tony Georgiton in exchange for Kaufman's approval of favorable loans from Melrose to Kaufman and entry into a wasteful naming-rights agreement, including all attorneys' fees, costs and disbursements as provided by law;

(e) On the Sixth Cause of Action – judgment against Defendants, jointly and severally, requiring them to disgorge their life insurance policies obtained via the Split-Dollar Life Insurance Agreements with Melrose to prevent Defendants' unjust enrichment

from the life insurance policies purchased by Melrose as a result of their lack of faithful service, dishonest acts, and wasteful conduct; or alternatively, a money judgment against Defendants in amounts equal to the death benefits of the life insurance policies as a result of Defendants' breaches of their fiduciary duties, including all attorneys' fees, costs and disbursements as provided by law; and

(f) An award in favor of the NCUAB for all pre- and post-judgment interest on the foregoing amounts, as provided by law, along with such other and further relief, at law or in equity, to which the NCUAB may be justly entitled.

## JURY DEMAND

Plaintiff respectfully demands a trial by jury of all issues properly triable pursuant to Fed. R. Civ. P. 38(b).

Dated:   New York, New York
February 9, 2023

Respectfully Submitted,

WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER, LLP

By:  /s/ Joshua Cash
JOSHUA CASH, ESQ.
MARK G. LEDWIN, ESQ.
150 East 42nd Street
New York, New York 10017-5639
(212) 915-5812
Joshua.Cash@wilsonelser.com
Mark.Ledwin@wilsonelser.com
File No.: 22294.00006

*Attorneys for Plaintiff*
NATIONAL CREDIT UNION
ADMINISTRATION BOARD,
as Liquidating Agent for
MELROSE CREDIT UNION